for ESG Capital, the appellant? Speak up, yes. I'm sorry. ESG has claims in this case, has alleged claims under both Section 10b and common law state, common law state claims. With respect to the 10b claims, ESG is required to allege facts with particularity as to the common law, state common law fraud claims. ESG is required to allege fraud with particularity but not intention and knowledge. Leading a 10b claim does require, does have a heightened standard, but it's not the impossible standard that the defendants would have this court believe. As the Supreme Court recognized in Tellabs and this court recognized in Reese, South Ferry, and Thompson in particular, which concerned an attorney's misrepresentations to an adverse party to a transaction. The test is whether the complaint states with particularity facts giving rise to a strong inference that the defendant acted with deliberate recklessness or engaged in knowing or intentional conduct. Viewing the alleged facts here and the reasonable inferences in the light most ESG has met this burden. So let's assume even if your allegations support an inference of deliberate recklessness, sufficient to state a claim under Section 10b of the federal securities fraud, how can we conclude that you have adequately pled actual knowledge of the fraud which is required in order to state claims for conspiracy and aiding and abetting? Your Honor, the allegations with respect to actual knowledge are similar to the allegations with respect to Santer, and I'd like to go through those at this point. In February, in February of 2011, February 9th of 2011, Bloomberg issued an article which is use of false names, swindling of victims, that he was arrested by the French police officers, that he had a judgment for fraud. Mr. Meyer read this article. Mr. Meyer also read the complaint in which Mr. Venable represented Mr. Stratos in the Nicole Murphy case. So they start out with that information. One week, one week after the Bloomberg article comes out, Mr. Meyer forms Somio for Mr. Stratos, an LLC that uses the name of the billionaire Carlos Slim's late wife to establish a name that Mr. Stratos can use to engage in further swindling of investors because he can't use his own name in light of the Bloomberg article. He was also troubled by the bank accounts where he got blacklisted at certain bank accounts and then Mr. Meyer's opened other bank accounts for him? Yes. Mr. Meyer knew that Mr. Stratos could not open any bank accounts, that no bank would deal with him, and therefore no bank also would deal with Somio if it was being used by Mr. Stratos. So the bank accounts, first of all, they used Venable's client trust account as the first place to deposit Mr. Stratos' money. Mr. Stratos' money goes into the Venable client trust account. The ESG money goes into the Venable client trust account. Mr. Meyer convinces Mr. Burns to release that money to Somio because Somio allegedly has purchased shares of Facebook, which Mr. Meyer knows is not possible because Somio has no money and no assets and no bank accounts. So he convinces Mr. Burns to release this money to Somio, but Venable doesn't release the money to Somio. Instead, Venable engages in 70 separate transactions from its client trust account to pay personal expenses of Mr. Stratos, including the civil judgment, fraud judgment that was referenced in the Bloomberg article, and Venable's own fees. After that... And wasn't there a car that was bought? Yes, a Land Rover, a condo in Las Vegas, all kinds of personal expenses paid out of a law firm's trust account. And that trust account was referenced to belonging... The whole trust account belongs to Venable, but that deposit was made with respect to Mr. Stratos. So they knew it was made with respect to Mr. Stratos, even though Mr. Burns was told that it was a Somio transaction. Well, some of this... Okay, some of it you're sort of preaching to the choir for me on some of this, but I do have a question on the agent's immunity rule and what I think your answer would be on that. And if it's your position that it does not apply because Meyer owed Mr. Stratos an independent professional duty, doesn't it follow from that that Section 340.6, One Year Statute of Limitation, bars any claims predicated on the alleged professional duty? Mr. Meyer owed ESG and Mr. Burns an independent legal duty not to engage in fraud. He had that obligation not because he was the attorney for Mr. Stratos or had any other kind of relationship. He owes that duty just like everyone else in the whole world owes that duty to not engage in fraud with another person. And the statute of limitations doesn't apply for two reasons. Number one, the cases suggest and the statute suggests that the statute applies to professional malpractice and breach of fiduciary claims brought by a client against their attorney. Now there is some California case law that suggests otherwise, but that's what the statute says and that's what the most recent Roger Cleveland case says, that it is not a case, any case involving an attorney. And secondly, the statute itself contains a fraud exception. Everything in this case is subject to the fraud exception. Fraud or fraud-based claims are subject to the exception so that the 340.6 doesn't apply. How crucial is that to the gravamen of what you're bringing here? I'm sorry, you're interrupting. Well, if, and I can't speak for anyone, and I mean we haven't obviously discussed this, but if we were to agree with you on everyone else but that, how does that affect your case? If the 340.6 applies to the state law claims, it doesn't, it can't apply to the fraud claim. By its terms, it doesn't apply to the fraud claim. So if, for example, the court were to conclude that somehow the conversion and breach of fiduciary duty and unjust enrichment claims were not fraud-based and subject to that exception, then we would need to look to see when the statute of limitations accrued. And in our view is that it accrued less than one year prior to the time the claims were brought because prior to that time, Mr. Burns intentionally misled the partnership and the limited partners as to whether there was any issue. The shares were purchased, but they could not be released for six months after the IPO was effective. So that was in November of 2012. So it wasn't until November of 2012 that the limited partners actually knew that anything had happened to them. And so therefore, they then brought the claim within one year of that November 2012 date. So the statute of limitations doesn't apply because ESG is not a client of Venable or Mr. Meyer. It doesn't apply because these are all fraud or fraud-based actions which are exempted from the statute, expressly exempted from the statute. And it doesn't apply because it didn't accrue until less than one year prior to the filing of the complaint in this case. And to respond to your question with respect to the bank accounts, Venable and Mr. Meyer, knowing that Stratos could not open any bank accounts, went down to Bank of America in its own building and opened up a bank account using its own power and persuasiveness with Bank of America for Sumea. Somebody comes into the bank account from ESG, Bank of America immediately regrets its decision and freezes the account because it thinks it's fraud or money laundering or something equally horrible. Venable doesn't stop there. It goes down to Bank of America again and says, oh, you just need to release these funds to us and not worry about it. So Bank of America releases the funds to Venable under those representations. Venable then persuades another law firm, Miller Berendez, to take five millions of it and open up its client's trust account and then goes to another bank, UBS, and opens a bank account again for Sumea. Did Mr. Stratos just get convicted of something? Yes. He was convicted of the fraud that underlies the civil action in this case. The Nicole Murphy criminal case is still pending, so he has not been sentenced yet on this case, but he has been convicted of the fraud against ESG in this case as a matter of a federal criminal conviction. So there's no question that there's fraud. There's no question that there's misrepresentations. And frankly, there's no question that Mr. Meyer and Venable had the actual, the allegations are that they had the actual knowledge. I'm trying to figure from, this was Judge Wright. So what was his, was his concern that this would, then attorneys could not make representations for their clients and therefore they would then be pulled into, what, why do you think he lost there? Good things. First of all, I wasn't involved in the case at that point. Secondly, there was never any hearing or oral argument in this case, so we never got to hear what Judge Wright thought or didn't think. But I think he did not view the allegations as necessarily establishing actual knowledge in the case, and he thought perhaps that there was an innocent explanation for what went on. But when you put it all together in timing, there is no doubt that Mr. Meyer and Mr. Venable's attorneys suggest that they were just, that Venable and Mr. Meyer were simply rendering routine legal services to Mr. Stratos. And I think that that's what Judge Wright believed. But there was little that was routine about the services in this case, including vouching for a client to potential investors, acting as the client's banker, paying the client's personal expenses out of your own trust account, running interference with banks that are reluctant to deal with the client, and running personal errands for the client. If you just look at those things, this clearly was not business as usual or providing legal services to Mr. Stratos. And that together with... And he had represented Mr. Stratos in another lawsuit, is that correct? Yes. Venable had represented Mr. Stratos in the Nicole Murphy fraud lawsuit, and that had been ongoing throughout this period of time, subsequently was dismissed in federal court and refiled in Florida court. Your Honors, if you don't have any other question, I'll save the rest of my time for rebuttal. Good morning, Your Honors. May it please the court, Kevin Rosen on behalf of Respondent Venable, LLP. What I'd like to do with the court's indulgence is to respond to... Are you going to be the only person talking or do you have... It looks like that, Your Honor. Okay. Okay. So you're the only one. I believe so, Your Honor. What are the other guys doing here? He's graciously agreed to defer to me, Your Honor. So what I'd like to do, which I think would be helpful, is to respond to some of the points that Judge Callahan and Judge Nelson you have keyed on in terms of certain of the allegations, because fundamentally what I'd like to try to explain to you is the description of this case does not comport with all of the factual allegations in this case. And that's an easy thing to say, but I'd like to take just a couple of minutes and try to walk you through that to demonstrate what I'm referring to. I think that's probably a good idea, because actually for me, this was pretty shocking in terms of that this is not the usual attorney behavior. And I can understand. I mean, there are people that represent someone for murder and they know that the person did it, but then they don't go to the DA and say, oh, my client told me he did it. Obviously there's attorney-client privilege and we have to, you know, attorneys can't be branded with the misdeeds of their clients, as it were, in the representation. But there's some very active involvement here in this, in representations here that seem to go beyond what I have, that I regularly see. You're going to have a tough job. Fair enough. So I appreciate that. I think I'm up for the challenge if the court will allow me to walk through some of this. And obviously if you have any questions, feel free. But what I will do is I will start with the two areas that Your Honors had focused on specifically in comments to Appellant's counsel. In that context, Judge Callahan, I think your point is important to keep in mind here, because we are talking about lawyers who are very often retained to represent and help clients who have been accused of wrongdoing. So there's an element of context that's important and unique to lawyers here that we do need to take into account. And I also think it's important, as you noted, that this is a fraud-based case. It is not a negligence case. I'm happy to discuss the pleading standard. I think the eclectic properties case... Well, it's a higher standard. There's no doubt about it. But there are particulars here. Right. But the question is, do the particulars show fraud? And that's exactly what I'd like to walk the court through. So without further ado, if you will, let me launch into a few of the examples. Well, let me just tell you that, okay, so some of the things that ESG has alleged as material omissions for purposes of 10b, they allege that Meyer made material omissions when he failed to reveal that, one, there was no Facebook deal, two, that Stratos, not Somaya Securities, was Venable's client, three, that Stratos was falsely representing himself as Ken Dennis to ESG, and four, that $2.8 million deposit would be immediately dispersed. Since we're not letting you proceed, I might add to that the payments that Venable allegedly authorized out of his trust account, over $300,000 to a professional gambler, over $90,000 for Stratos to buy a Land Rover, and $50,000 for a deposit on a condo in Las Vegas. Venable is also alleged to have authorized payments of $350,000 to itself for lawyer's fees. Now, maybe you can proceed. Thank you, Your Honor. I think I certainly had intended to cover all of those and, frankly, a couple more, because I think, fundamentally, there's a series of building blocks that the appellants use to build their case. So I'll focus and start with what... Well, we're waiting for you to perform your magic. All right. Here I go. I'm going to do my best, Your Honor. Let's start with the use of funds, and I think what's important to begin with there, and what I'm going to tell you is only with respect to what's in the complaint. This is what is factually alleged. The $2.8 million was a reimbursement for Stratos' having deposited his own funds initially with Facebook. That's what's alleged, page 201 of the record, paragraph 108. So what the initial $2.8 million is is a reimbursement for money that Stratos has deposited to lock in, if you will, the Facebook transaction. And I'll come to the Facebook transaction, because fundamentally here, Judge Callahan, for example, you posed the question, Mr. Meyer failed to disclose that there was no Facebook transaction. Respectfully, what I would say is the question here is, have they alleged facts to show that Meyer knew there was no Facebook transaction? I think, in fairness... But he vouched for the guy, too. He said he's good for it or something like that. And I'll come to that. But again, it's all about, unless you're going to take the position that a lawyer is not entitled to rely on what his client says, then the question is, what facts are alleged to establish that Meyer knew that some of these things that we're talking about were not accurate? Well, how about the fact that he was representing Stratos in a suit alleged that Stratos stole $7 million? Yeah. What about that? That's the Nicole Murphy suit, which was dismissed. And first of all, Meyer is a transactional lawyer. He didn't personally represent Mr. Stratos, but Venable did. Other lawyers at Venable did. And that action was dismissed. But then he was prosecuted for crimes? Yeah. And Mr. St... Okay. So that makes it better? No. I mean, crimes are a higher standard of proof. No, I... Okay. But do keep in mind, Your Honor, that... It's like they dismissed the wrongful death, but they charged you with murder and convicted you? But again, the issue is what Venable knows. And so Your Honor raised the question, does Venable know something that suggests that anything that Mr. Meyer is saying is not true? Because Venable, someone else at Venable, happened to represent Mr. Stratos in Nicole Murphy's lawsuit, a lawsuit which was dismissed. No allegations. That lawsuit had nothing to do with the Facebook transaction, all right? So the question is, what about the representation of the Nicole Murphy lawsuit that says that Mr. Meyer does... Knows that there's no Facebook transaction? And the answer is nothing. You refer to the underlying criminal prosecution. Again, I think if we're... I mean, do lawyers normally go down to banks and open accounts for their lawyers? And then... I've never heard that before. Well, keep in mind that what is happening here is that lawyers do represent clients who are trying to dig themselves out of issues that have confronted them. And there's no question that Mr. Stratos... Well, you do, but you can't become a co-defendant in the process. Right. But then again, that's the conclusion. The question is... Well, but it could be an inference from all of this. I mean, he doesn't look like your typical lawyer. I mean, he looks like he's a co-conspirator almost in some of this. Well, but if you start with what has been alleged, that the $2.8 million, and Judge you refer to, came out of that initial $2.8 million payment, there's no allegation, and in fact, there couldn't be, that the $7.2 million payment and the $4.2 million payment, that there was any of those by ESG, that any money came out of that. So we're talking about the initial $2.8 million payment. So... And if it's as alleged that that initial $2.8 million is to reimburse Stratos for money that he had previously paid as a deposit on the Facebook shares, in a time that the complaint is very clear Meijer is not involved, remember, Meijer is not alleged to have become involved in this process at all, until the Facebook transaction is done and it's time for payment. And so, if Mr. Meijer, based on the allegations in the complaint, understands that Mr. Stratos is being personally reimbursed that $2.8 million, because he put that money as a deposit in order to secure the transaction, and then effectively what's going on, Mr. Stratos is using that $2.8 million to capitalize Sumaya. And so if Mr. Stratos decides that it's appropriate for Sumaya to take some of the money that is his reimbursement, that he's using to capitalize Sumaya, and allow payments to be made to him, that doesn't suggest that someone knows that there's a fraud going on. All they know is that Mr. Stratos is getting his money back for purposes of a deposit and authorizing that that money be used. And sure, there's no question that there were issues associated with the bank account because of the prior history, which Venable, as lawyers do, is engaged to help correct. We heard counsel acknowledge part of what is done with that money is to pay prior judgments, to help Mr. Stratos, which is what lawyers do, dig himself out of the hole that he is in. And so we have to be careful about tagging lawyers. Just because there's a fraud that went on, and in hindsight, which we know from this court's authority, we're not really supposed to use him, but just because there was a fraud that ultimately happened, the question is, at the time Mr. Meyer is looking at this, does he know that there's fraudulent activity going on? Okay, but let me ask you this then. Sure. Okay, so you're kind of giving an explanation as if we were having a trial and all of that. But it seems to me, under Taleb's Inc. v. MACOR, that if where there's an inference of scienter, it is just as likely as an inference of non-fraudulent intent. When you can make both of those inferences, the plaintiffs met their scienter requirement. So if you can explain it both ways, then it's still, you know, to kick someone out at this particular stage, it seems that Taleb says that that's wrong. And Your Honor, what I would say is, I am not, what I am telling you is not an explanation both ways. What I am telling you is that there is, these are the facts that are alleged, and they don't reasonably suggest that there was knowledge of fraud. And I think it's important to keep focused on what the standard is, as this Court said in eclectic properties, that where a complaint pleads facts that are merely consistent with the defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Plaintiffs cannot offer allegations that are merely consistent with their favorite explanation, but are also consistent with the alternative explanation. So if what I am telling you, if you were to conclude that what I am telling you is consistent with an alternative explanation, under eclectic properties, for example, which itself is saying that it's applying Twombly and Iqbal as well, and we know Taleb's is an even higher standard, 10B, that's not good enough. Well, okay, so when you're saying, okay, this is, they were just using that 2.8 million to, they were using it in different ways. So if that's the case, do Meyer and Venable owe an independent legal duty to ESG when Meyer and Venable accepted and disbursed ESB's funds? No, not at all. So they can just do whatever they want with it. Well, but, respectfully, Your Honor, I don't think that's a fair characterization, and here's why. ESG authorized, and this is at page 231 of the record, authorized without restriction the release and use of those funds. So we know from the complaint that the 2.8 million dollars is to reimburse Stratos, which then ties into why funds are being used, certain payments are being used. We know that there's no restriction given by ESG in the authorization letter, which I said is at page 231 of the record, and we also know that Mr. Meyer was not involved in any of the negotiations, no documentation, nothing, with respect to the Facebook transaction. So Meyer is coming in at the point in time when it's time for payment, with respect to the Facebook transaction, where his understanding is the initial 2.8 million dollars is to reimburse Stratos, and ESG puts no restrictions on the use of those funds. So where did the 2.8 million dollars, was that in the trust account? And so, yes, because Mr. Stratos, because of the problems he's encountered, including the litigation with Nicole Murphy, and let me just say one other thing with respect to the bank account. The only allegation in the complaint is that Mr. Stratos had problems at Bank of America because it triggered their anti-money laundering red flags. It wasn't because Bank of America thought there was some fraud being perpetrated by Stratos, and that's it. Page 210 of the record, paragraph 158. So I think we need to be very careful about what's actually factually alleged versus the story that is being told. Well, isn't money laundering illegal? Money laundering is illegal, but the salient issue is, does money laundering, which is not an issue at all in this case, suggest, create a reasonable inference that Meijer knows that Stratos is committing the fraud with respect to the Facebook transaction. But that's not money laundering, Your Honor. Money laundering could also be the magnitude of the payments. But Meijer knows he has to go to Bank of America where he has a personal relationship because Stratos is blackballed at other banks, right? Well, Meijer knows that Stratos, there's no question that Stratos is having a problem opening a bank account. But again, that puts us back into the context of a lawyer who's retained to represent a client who has had prior issues. But it's kind of like if you buy a gun for someone else that you know is prohibited. Why would he assure ESG that Dennis and the sale were legitimate? Well, that's not what's alleged, Your Honor. That's not what he said. Here's fundamentally things to keep in mind. We have Stratos who clearly is posing as Ken Dennis. Well, why don't we just go to trial on this and have it all hashed out? Because in fraud cases, I appreciate the proposition that everyone should have their day in court. But there's a countervailing proposition that this court had all courts balanced. There's a gatekeeper element here. Well, and there's some, this, your client would never win in a trial. I mean, jurors already don't love lawyers and if they, getting to this, so you have a legal right to win if they can't sufficiently allege it and that's a much better place for your client to be because 12 people in the community, I did a lot of jury work, are not going to look kindly on this. Well, then I would say all the more reason why it's better. Well, that's what, if you're entitled to a legal judgment, that's exactly, that can be the right. Qualified immunity cases with police officers are another thing. I mean, that, if they're entitled to qualified immunity under the law, then you do it because jurors probably wouldn't be able to follow the law. So if there isn't a triable issue or whatever, or if you haven't, if they haven't met their burden. But the law also recognizes that it's, that there is a cost associated, an unfair cost associated of making a defendant, particularly in a fraud case, sit through the process. This court in eclectic properties, you know, characterized it as the Supreme Court has as the interim effect. So there's a balancing that goes on. It's not just about, oh, let them have their day in court and see what a jury says. We have an absolute right. It's reflected in this court's jurisprudence, in the Supreme Court's jurisprudence, in the congressional legislation with respect to the PSLRA, and it's embodied in the higher pleading standard of Rule 9b, as well as the standards of Rule 8. Well, we saw a lot of security cases when the market went bad that people were suing and they wanted to blame someone and the whole problem was the market went bad and those got kicked out of court because they couldn't allege with any specificity that anyone had done anything more wrong than what happened to everyone else. But this has some, this has some, this is like almost like a movie here. Well, it's, I under, well, the question is, again, I understand the story that's being told, the movie script, if you will, but we, here we're talking about and the analysis about what is, what is factually alleged that they don't talk about in the script that they're writing for you. Well, let me, let me just, this is like a little tiny piece of it, but I was asking appellant's counsel on this, on the 340.6 one-year statute of limitations. I have some view that that might be a correct ruling, but what's, can you counter what she said on that? On, with respect to 340.6, California law is very clear, it is actual fraud and that cause of action only. For example, case law we cited makes it clear that even constructive fraud fits within 340.6. Well, but it's, but I think it's predicated on a, a professional duty. So when that, if, if the one-year statute of limitation bars any claims predicated on an alleged professional duty, what's the professional duty here that's outside the one-year, where does that start? Sure. What I think counsel and perhaps Your Honor are referring to are the, I'm going to use the defendant's name, the Engstrom case, the Prakash, Prakash Palan case. That case, that's a conversion case, but that case is, is analyzing the issue at the end of the day under the probate code because that court decided that the more specific probate court code statute and statute of limitations was applicable rather than 340.6. And more fundamentally than that, the issue is, is, is the, the connection to professional services. So when they're saying fraud-based claims, they're saying it in the context of the probate code. And that case is very specific in that it's dealing with the probate code. And so I think that is the answer to your question, Your Honor. And, and if you look at the California cases that we cited, they're very clear, consistent with the statute that, that all causes of action other than actual fraud are subject to 340.6. The only case we're talking about is conversion, as I say, and as we said in the brief, there were other issues with the way that they pled their conversion claim. But what I'd like to do, assuming I've adequately answered your question, is I, it is very important to me to at least try to convey to you why there are issues and, or a, a disconnect between the story you're hearing and the factual allegations that are being made. I've said what I've said about the payments and the fact that it's- Well, give it, give us an example. Yeah, I'll give you, I'll give you some examples. Okay? Yeah. Right at the outset of their brief, on page one, they say Meyer was a liar because he told Burns that Venable represented both Stratos and Somaya, okay? Right at the outset, when they talk about, here's why we win, and they tell you in a paragraph, that's one of the core pieces they tell you. Well, what they told the district court, ESG told the district court that Meyer was counsel for Stratos and Somaya. That's at page 396 of the record. They told the district court that Venable drafted Somaya's operating documents. That's at 386 of the record. They give specific examples of things that Meyer did for Somaya, including, for example, retaining a client under, their words, under lawyer-client privilege. That's at page 50 of the record, paragraph 66. That's their initial complaint. Venable drafted the formation documents for Somaya and dealt with incorporating it in the Secretary of State, incorporating it with the Secretary of State of Delaware. Those are all functions by lawyers. So when they, as part of their script, tell you that Meyer's a liar because he told Burns that they represented Somaya, that is inconsistent with the facts that they've alleged, okay? So one of the linchpin lies of their case is actually not a lie at all, according to them, according to the allegations in the complaint. Another example, what I'll call a little bit of sleight of hand. They tell you Meyer falsely told ESG that Somaya was Slim's company. That's at page 2 of their reply brief. Well, when you look at the allegations, all the allegations say is that Meyer confirmed that Slim was affiliated with Somaya. That's at page 198 of the record, paragraph 95. Why is that important? There is no factual allegation whatsoever suggesting that Meyer knew that Slim was not affiliated with Somaya, and that's what Meyer's alleged to have said, affiliated. Meyer's not alleged to have said Slim owns or has an ownership interest in Somaya. In fact, what does Meyer do? He files the documentation with the Secretary of State that shows Stratus as the owner and shows Slim as not an owner, and certainly Slim could be affiliated. Again, we're talking about whether Meyer knows what's being told to him by his client is false. Certainly Slim could be affiliated with Somaya if he's a lender, if he's some sort of promoter. It's not exclusive. So to suggest that Meyer lies because he says he told Burns that Slim didn't own or invest in Somaya, that has nothing to do with what they alleged, because they alleged affiliation only, and that's not exclusive. Part of their story as well, a big part of their script, is that Somaya was created to hide Stratus, but here's what they don't point out in their script. As I said before, Meyer publicly listed Stratus in the formation documents. If the question is, is Meyer trying, knowingly working to commit this fraud by concealing the existence of Stratus, which is the very foundation of their theory. Why in the world is he publicly filing documents with the Secretary of State that list Stratus as the owner? Page 196 of the record, paragraph 76. May I just ask one question, which you might deem irrelevant. Is there anything in the record to show why Venable fired Myers? There's nothing in the record to show why Venable, well, if I may, the predicate to your question, Your Honor, is also not in the record, whether he was fired. It's not in the record. I can tell you he was not fired, but there's nothing in the record about that. I would urge you not to ask whether he was fired because that itself is not in the record. He left the firm. As lawyers do for many reasons. Okay. You've answered it. Thank you, Your Honor. One more thing about Sumaya created to hide Stratus' identity. Sumaya was created in, this is again, all in a complaint. Sumaya's created before, before Meyer is alleged to have known anything and been told anything about the Facebook transaction. So if Meyer is creating Sumaya, as the script goes, in order to facilitate knowingly, the Sumaya's created before he's told anything about the Facebook transaction. Unless he's just creating it for any upcoming fraud. Okay. But then I think that gets back to our point that we were talking about for lawyers. Okay. So if a lawyer is engaged to help a client who's had issues work his way through those issues, know, for example, that part of the money is used to pay judgments and pay earlier judgments and they're defending a lawsuit, which is dismissed. So a lawyer's hired. Should we, is it fair to just infer? I would submit it's not consistent with the standards of knowledge that I talked about in eclectic properties. But if lawyers represent clients who have been accused of wrongdoing. No, I understand your point. From my perspective, I don't have any additional questions. I don't know if my panel members do. We're going to play over time here. Yeah. I think that I would urge your honor to be cognizant of the chilling effect of being too quick. And I don't, I don't mean that disrespectfully. I know the courts put a lot of time into this, but there is a chilling effect in the context of lawyers representing clients who may have been engaged in wrongdoing or certainly accused of wrongdoing. There is a connection. There's an inevitable connection, especially if it turns out that there is truth to what the accusations are. And it is very easy then, you know, the formula, here's the formula, right? You should have figured it out. I can plead fraud generally under 9b. I'll forget the fact that rule eight applies. Don't bother following the Supreme Court in Twombly and Ixbal. I'll just turn at what is at worst a negligence case in terms of negligently relying on what your client tells you or not fully, not, not conducting an independent investigation of every single thing your client tells you. Well, now I understand that you're saying it's a slippery slope, but this might be an avalanche. So I don't have any further questions. Thank you. But why, why, I mean, the thing that bothers me is Meyer assuring ESG that Dennis and the sale were legitimate. Well, but your honor, that's, if you look at the complaint, that's not what he's alleged to have said. And the, the, what, what they say is that Meyer, that their point is that Meyer never spoke with Dennis or Slim and therefore he shouldn't be able to, he shouldn't have appropriately relied on Stratos telling him whatever it is Meyer conveyed. So Meyer is telling, here's your honor, here's what's going on and that it's precipitating your question. Meyer's being asked certain questions in a, in a one, in a, in a seven minute conversation between the point in time and the next day, the $2.8 million is paid. So we're talking about a seven minute conversation, okay? Meyer is being asked certain questions about Slim. It's not, your honor, as, as what's being said, I would urge you not to rely on what's in the brief, but what they actually say was said in the complaint, the factual allegation in the complaint. So Meyer is reporting what his client has told him and it, it's in the context of, it's undisputed and I think this, I want to make sure this is, is understood. Ken Dennis is a real person. Ken Dennis exists. Meyer knows he exists, he exists. Ken Dennis is identified as the CEO of Sumaya. It's not alleged, it's never alleged that Meyer told Burns he had spoken. Isn't Ken, Ken Dennis actually Troy Stratus? No, no, that's, that's the important fact that's critically, critical here. Ken Dennis is a person independent of Troy Stratus. The allegation is Troy Stratus was passing himself off as an, as that existing person and that, that's, that I fear is part of the impression one gets from the script you're reading in their brief. So, and Meyer knows that Ken Dennis exists and Meyer never is not alleged to have told Burns that he spoke with Ken Dennis or that he ever spoke with Carlos Slim. He's not alleged, it's not alleged that Meyer told ESG that Dennis bought Facebook shares for Slim. If you look at the complaint, page 198 of the record, paragraph 89, Stratus is the one who made that statement. So you're getting, part of what's going on in the briefing is a conflation between Meyer and Stratus and a conflation between two independent people, Stratus and Dennis. And Meyer knows Dennis exists. And so fundamentally, what this question boils down to, I think at the end of the day. You're really saying the complaint is a fraud, huh? No, I'm not, no, I, I, I, Close to, close to. No, your honor, I think what, it's a question of advocacy, it's a question of what facts somebody focuses on, what facts somebody doesn't focus on, and how one spins one's case. I certainly disagree with the fact that they have not acknowledged certain facts. Another fact that you don't see anywhere in their brief, if, if Meyer knows that this is a fraud, why in the world is he doing research on the secondary market for Facebook shares, which is alleged in the complaint? If he's knowingly participating in the fraud, how is that consistent? You, you didn't hear anything about that in that script that you read. So, so fundamentally, what this is about, at the end of the day, at best, is that Meyer negligently failed to figure out that in fact, this was a fraud. And or, Meyer had an obligation to investigate the accuracy of what Stratus was telling him about the transaction, and it's very little about the transaction. And it's also important to keep in mind that everything Meyer is saying about this, the transaction relates to Sumaya, which implicates the whole, the, the Janus point that I briefed. I don't think I need to get into, I know, I know this, this issue. Yeah, well, listen, you're over, you're over your time by 17 minutes and 47 seconds. I hope at least it was a productive 17 minutes, Your Honor, in terms of enlightening the panel on what I think is an important part of the factual story to this case. And I appreciate the court's indulgence in letting me do that. It's been a, it is, well, these are complicated cases. Okay, thank you. Thank you very much, Your Honors. Thank you, Your Honors. So here's what Meyers knew. He knew who Stratus was. He knew before he had, during this period of time, 25 in-person meetings with Stratus and 100 telephone calls with Stratus. Stratus was the only client available. Although Meyers told Mr. Byrne something different, the only client was Mr. Stratus, not Mr. Dennis, not Sumaya. Meyers knew that Byrne thought he was dealing with Ken Dennis. In fact, there is an email in July from Mr. Byrne where Mr. Byrne says to Mr. Meyers, I just spoke to Ken Dennis. And Mr. Meyers knows that he didn't just speak to Ken Dennis. The only phone number that Venable has was for Stratus, not Mr. Dennis. Mr. Dennis, by the way, is Mr. Stratus' stepbrother whose name Mr. Stratus was using because he couldn't use his name. Meyers also knew that the email address that Byrne was using to communicate with the imposter Ken Dennis was actually Mr. Stratus' email address because that's the same email address that Mr. Meyers used to communicate with Mr. Stratus. Originally, the deal was set up from the beginning that ESG would deposit the money into Venable's trust account. That was what Mr. Stratus told Mr. Byrne from the beginning and it was to be escrowed. The money comes in on April 19th and the next day, April 18th, I'm sorry, and the next day Mr. Meyers convinces Mr. Byrne to release the money because this alleged deposit had been made. Mr. Meyers does not have to investigate his client's every word, but he's not allowed to get on the phone to a potential investor and vouch for his client on the basis of information that at best he doesn't know and at worst he does know. He knows that Mr. Stratus is impersonating Ken Dennis. If Mr. Meyers knew that the deposit, this was the $2.8 million, right? Right. Was for to secure the Facebook shares, right? Yes. How does it equate that then he can use it to pay off Mr. Stratus' other judgments that have nothing to do with Facebook? It doesn't, Your Honor. In fact, Mr. Byrnes agreed that the money could be released to Sumaya to replace the deposit that Sumaya had allegedly made to obtain Facebook shares. Mr. Meyers knows that no deposit was made, that there was no replacement going to be happening, and that subsequently the Venable Trust Account, if you go back and look at all of those, most of the deductions from the Venable Trust Account were on Mr. Meyers' authorization. He's the one that said, release money for this purpose, release money for that purpose. It did not go to Sumaya to replace a deposit. It went to Mr. Stratus, not Sumaya, to pay Mr. Stratus' personal expenses including the fraud judgment, Venable's fees, the condo, the Land Rover, and all the other personal expenses that Mr. Stratus... Well, if a lawyer takes money knowing what it's for, do they have... I asked and he said, well, we don't have any duty to ESG as to how we spend the money in our trust account. Is that true? That is not true. There's two cases, at least two cases, or three cases, Engstrom and Rickley and Vertainen, and all of those have to do with lawyers that are taking on duties with respect to the other side. In Rickley, it was a trust account, remediation funds placed into a trust account. In Vertainen, it was holding stock in an escrow, and in both of those cases, the court said, you have an obligation to the other side. If you're going to take on these duties, you can't just say, oh no, I just represent my client and walk away. You don't just represent your client. You have obligations to the other side. So they simply... And they had an agreement with Mr. Burns as to what the money was supposed to go for. To begin with, it was supposed to be escrowed there until the stock came in. Subsequently, Mr. Burns misguidedly agreed that it could be used to replace the SMAE deposit. Once he entered into that agreement with Mr. Burns, he had an obligation to make sure that that's in fact what the money went for, and he did not. This stock was going to be distributed before there was an initial public offering. After, Your Honor. What happens is, and I didn't know this before either, but after, what happens is, if you own stock before a public offering, then you enter into an agreement, basically, that you won't distribute it until six months after the public offering so that it doesn't mess up the investment banker's public offering. So the people that had the stock already before the public offering agreed to sell. This is the way it's supposed to work. Would agree to sell, but you wouldn't actually get your stock until six months after the public offering. And so that's why the time period, that's why the limited partners actually didn't know that they didn't get the stock that they'd invested in until November of 2012. I read in the New York Times this morning that the SEC has issued regulations on this entire subject matter. Did you see that? Yes, Your Honor. And there also were some issues with respect to this, even at the time that there was some regulatory concern about the way these things were happening. I didn't read the whole article. I had to get to court. Three points that I'd like to make. Paragraph 183 of the complaint says that Mr. Meyer was terminated by Venable. So it doesn't say fired, it says terminated, but it didn't say that he went off to practice law somewhere else. It said he was terminated by Venable. Paragraph 69 says that in early 2011, Mr. Meyer and Mr. Stratos and Venable hatched this plan so that Mr. Stratos could continue to swindle victims using the Somaya name, and so that's why this was set up from the beginning. And finally, one of the reasons one might suggest as to why Mr. Meyer was investigating Facebook pre-IPO shares was so that he would have the information he needed in order to perpetuate the fraud. So the fact that he investigated it says nothing about the legitimacy of his thoughts in this case. And unless the court has any other questions? All right. Thank you. Thank you.
judges: Pregerson, D.W. Nelson, Callahan